STETSON (DUNLAP v.). See Case No. 4,-164.

---

## Case No. 13,382.
### STETSON et al. v. The PEPITA.
[3 Hughes, 483.] [1]

District Court, E. D. Virginia. May 30, 1878.

COLLISION—SHIP TO WINDWARD—RIGHT OF WAY.

Example of collision happening by violation of rule 17 of the rules of navigation.

[These were cross-libels by Stetson, Garry & Co. against the bark Pepita and Von Lind & Co. against the schooner William Slater.]

HUGHES, District Judge. Since hearing the evidence and arguments in these cases at bar I have given several days to the study of them, not so much because they seemed difficult of decision in themselves, but because of the glaring conflict which displayed itself in the voluminous evidence which was taken, and the necessity I was under to discard as false a good deal of testimony on one side or the other. By sifting the evidence carefully, and planting myself upon facts which do not admit of doubt or dispute, I have made up what I believe to be a true statement of the facts of this controversy, as follows: The collision which is the subject of controversy took place between the German bark Pepita and the American schooner William Slater, at 10 a. m., on the 6th of October last, at a point about three and a half miles N. N. W. from Cape Henry, near the intersection of what is called the Bay Channel, coming out from Chesapeake Bay, with what is called the Cape Channel, coming out from Hampton Roads. Both vessels were on the port tack, moving under a stiff breeze; the bark heading E. by S. from Old Point Comfort, and the schooner heading S. S. E. from the bay. The wind was from the N., but was baffling between N. by E. and N. by W. The bark was to the leeward, with about three points of the wind free. The schooner was to the windward, with the wind nearly aft. Both vessels were full laden, bound to sea; the bark with resin and flour, the schooner with soft coal. The measured tonnage of the two vessels was nearly the same; that of the bark 231 79/100 tons, that of the schooner 221 tons. They were both dull sailers, the bark being rather the faster of the two with equally favorable winds. The tide at the time of the collision was in ebb, and had been so for two or more hours. The schooner was moving with a fairer wind at a speed of five to six miles an hour. The bark, with less

favorable wind, was moving at about the same speed, certainly not much greater, except for a few minutes just preceding the collision, when a slight change of her course to the leeward gave her a better wind. The vessels came together on intersecting courses, which made an angle with each other of twenty-eight to thirty degrees. The crew of each vessel, therefore, naturally supposed the other was overtaking her, whereas they were moving at nearly equal speed to a converging point. The vessels came together at an angle of about forty degrees. The schooner struck the bark's stem and port bow a side blow from the rearward, bending over and splitting her cutwater and wrenching it from the stem, but not bruising it on its starboard side or rubbing the paint on that side. The concussion upon the schooner was upon its starboard quarter, not severe enough to awaken a child sleeping in the cabin, but causing an indentation on the vessel of some six inches in surface and one inch deep. The damage to the bark was such as to require that she should be unloaded for repairs at Norfolk. This was not necessary with the schooner, the damage to which was chiefly in her rigging from fouling with the bow of the bark. As before said, the collision was from the starboard quarter of the schooner striking the port bow and the side of the stem of the bark by a glancing blow in a forward direction. All hands were on deck on the bark at the time of and for an hour or more before the collision, and there was a regular lookout on her forecastle deck. There was no lookout on the schooner. The man considered as the lookout was in the rigging at work with the sails. Except the helmsman, there was no one on the deck of the schooner but the master and a young woman passenger with whom he was conversing, and to whom he was pointing out objects of interest in sight until within a moment or two of the collision. A few minutes before the collision the bark fell off to the leeward from her E. by S. course, to get out of the way of the schooner, although she was near a lee shore. Her helm was aport at the time of the collision. Until a moment or two of the collision the schooner's helm also was aport. Then the master seized it from the helmsman and put it down hard a starboard, but too late to avoid a collision, which happened in consequence of the schooner, with helm aport, running across the bow of the bark. Except this futile and too tardy action of her master, the schooner did nothing to avoid the collision. The case falls within rule 17 of the American rules of navigation, which requires that, "when two sailing ships are crossing so as to involve risk of collision, then . . . . . if they have the wind on the same side, or if one of them has the wind aft, the ship which is to windward shall keep out of the way of the ship which is to leeward." This rule means by "crossing"

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

the coming of two ships towards a point on lines at right angles or on smaller angles with each other. Here one vessel was moving on a S. S. E. course, and the other on an E. by S. course. In consequence of the bark's porting her helm and falling off to the leeward a few minutes before the collision, she may at that moment have been heading E. by S. ½ S., or E. S. E. The duty of the schooner, under the rule 17, was, therefore, to have starboarded her helm some minutes before the collision; but she did nothing until her master, when it had become too late, seized her helm and put it hard down with his knee, just before the moment of collision. The schooner being to windward, rule 17 placed the onus of starboarding her helm and getting out of the way upon her, and required nothing of the bark. The schooner was in fault in not having starboarded her helm in sufficient time before the collision to get out of the way, much more, in having ported it at all, and I will decree accordingly.

It is not inappropriate, before dismissing the subject, to examine somewhat particularly the theory on which the owners of the schooner based their case. They hold that the case falls under rule 22, which requires that "every vessel overtaking any other vessel, shall keep out of the way of the last-mentioned vessel." They accordingly claim, that the bark was behind the schooner; that she was the faster sailer of the two; that she was therefore overtaking the schooner; and that consequently it was the bark's duty to keep out of the way of the schooner. They also insist that the wind was at N. N. W.; that the bark, on coming out from Old Point Comfort to Thimble light, did not take the Cape Channel out to sea, but kept straight on, on a N. E. by E. course, across the Tail of the Horseshoe, into the Bay Channel; and that she thence came down the Bay Channel to the point of collision, and not down the Cape Channel; and that she was, therefore, to windward of the schooner, and was following and overtaking her some time before the collision, and at the time of collision. But it is clear, to my judgment, that this theory cannot be reconciled with the indisputable facts of the case. The official report says, that the wind at Old Point at about 8 a. m. was N. It also shows that at 12 m. the wind was N. W. The schooner's testimony is, that the wind was baffling on the bay. It is fair to infer, therefore, that the wind did not get any further than N. N. W. at any time before 10 a. m., the time of the collision; and that its average point up to 10 o'clock was not west of N. by W. The tide, by the official report, was high at 7.20 a. m., and must have been in ebb from 8 to 10 a. m. Now the bark passed Old Point at 8.05 a. m., and got as far as Thimble light at 8.40. If it continued on in that same course of N. E. by E. across the Tail of the Horseshoe into the Bay Chan-

nel, which is a distance of nine miles from Old Point, or six miles from Thimble light, it had while on that course no point of the wind free, was close-hauled, and could not have moved faster between Thimble light and the Bay Channel than it had moved between Old Point and Thimble light. As it had sailed three miles in thirty-five minutes between Old Point and Thimble light, it would have consumed an hour to seventy minutes in reaching the Bay Channel from Thimble light, and therefore would not have reached Bay Channel, at a point beyond the Tail of the Horseshoe, about N. E. by E. from Old Point, until 9.45 or 9.40. But this point is five miles from that where the collision happened at 10 o'clock; and the bark could not have gone that distance in the fifteen to twenty minutes which were left to it between 9.40 and 10 a. m. It also seems to me to be simply preposterous to suppose that the master of the bark, who was making his fifteenth voyage from Hampton Roads to Brazil, should, on a beautiful morning in broad day, on a good tide, with a favorable wind, have done so unseamanlike a thing as to leave the direct route of the Cape Channel, to cross over the shallows of the Tail of the Horseshoe, and to get into the Bay Channel, which was out of his course, and several miles farther than the direct route to the Capes. A theory which requires the court to believe either that the master of the bark would have chosen such a route, or that he could have accomplished it, and made the collision by 10 o'clock, requires it to abandon the probable and to adopt the improbable and impossible. I cannot do otherwise than discard it; and the failure of this discarded theory is a breakdown of the schooner's case.

---

STETSON (SANBORN v.). See Case No. 12,-291.

STETSON (STURGES v.). See Cases Nos. 13,568 and 13,569.

STETSON (UNITED STATES v.). See Case No. 16,390.

STETSON, The D. S. See Case No. 4,104.

STETSON, The M. B. See Case No. 9,363.